JEREMIAH CARPENTER, APPELLANT, v. THE PROVIDENCE WASHINGTON INSURANCE COMPANY.

A policy of insurance contained a stipulation, that if the insured then had, or thereafter should have, any other insurance upon the same property, notice thereof should be given to the company, and the same indorsed upon the policy, or otherwise acknowledged by the company in writing, in default of which the policy should cease.

A bill was filed in equity by the insured, alleging that notice was given to the insurance company, and praying that the company might be compelled to indorse the notice upon the policy, or otherwise acknowledge the same in writing.

When the answer of the company, sworn to by the then president, denies the reception of the notice, to the best of his knowledge and belief, the question becomes one of fact and of law; of fact, whether the evidence offered by the complainant is sufficient to sustain the allegation ; and of law, whether, if so, this court can compel the company to acknowledge it.

The answer being responsive to the bill, and denying the allegation, under oath, the general rule is, that the allegation must be proved, not only by the testimony of one witness, but by some additional evidence.

Several qualifications and limitations of this rule examined.

The circumstances of this case are such that the general rule applies.

Two witnesses are produced, by the complainant to prove the notice, but neither of them swears positively to it, and the circumstances of the case do not strengthen their testimony.

The rules by which parties are sometimes allowed to introduce parol evidence with reference to a written contract do not apply to this case, where the parol proof is offered by the complainant, seeking to show a fact which, if true, would establish a breach of duty in the defendants, happening after the original contract was made.

The question of law which would arise if the notice were sufficiently proved by the complainant need not be decided in this case.

THIS case was brought up by appeal from the Circuit Court of the United States for the District of Rhode Island, sitting as a

court of equity.   The bill was filed by Carpenter against the insurance company, and referred to an action at law, which he brought against said company, in 1839, and which was brought, by writ of error, to the Supreme Court of the United States.   It is reported in 16 Peter , 495.   The opinion of the court sets forth the facts in the case, and they need not be repeated.

The present bill averred that the Providence Washington Insurance Company did receive notice of the existence of an insurance made at the office of the American Insurance Company, which said notice was given under the terms of the policy, and that it was the duty of said Providence Washington Insurance Company to have indorsed said notice upon said policy, at their office, or otherwise acknowledged the same in writing, by reason of which neglect the complainant lost his right at common law to claim the amount of the insurance, viz. fifteen thousand dollars.   It then prayed for a decree to compel the said company to indorse said notice on said policy, or otherwise acknowledge the same in writing, according to the terms of their policy, as they long since ought to have done, and further to compel the said company to pay the said sum of fifteen thousand dollars, with interest, &c., &c.

By referring to the record in the former suit, it will be seen that Carpenter and his assignors obtained policies of insurance from two companies, as follows : —

| Providence Wash. Ins. Co. | | American Insurance Co. | |
|---|---|---|---|
| 1835. | September 27. | 1836. | December 12. |
| 1836. | September 20. | 1837. | December 14. |
| 1837. | September 27. | 1838. | December 11. |
| 1838. | September 27. | | |

Prior to the policy of December 12th, 1836, the then owner of the property insured made an erroneous representation of the value of the property proposed to be insured, which vitiated the policy, and a suit brought upon it was abandoned.

The policy of September 27th, 1838, upon which the suit at law and the present proceeding in chancery were founded, contained, amongst other provisions, the following : —

"And if the said insured, or their assigns, shall hereafter make any other insurance on the same property, and shall not, with all reasonable diligence, give notice thereof to this corporation, and have the same indorsed on this instrument, or otherwise acknowledged by them in writing, this policy shall cease and be of no further effect."

"And provided further, that in case the insured shall have already any other insurance against loss by fire on the property hereby insured, not notified to this corporation, nor mentioned in nor indorsed upon this policy, then this insurance shall be void and of no effect."

Annexed. to the policy were the proposals and conditions on which the policy was asserted to be made, one of which was as follows.

" V. Notice of all previous insurances upon property insured by this company shall be given to them, and indorsed on this policy, or otherwise acknowledged by the company in writing, at or before the time of their making insurance thereon ; otherwise the policy made by this company shall be of no effect. And in case of subsequent insurances on property insured by this company, notice thereof must also, with all reasonable diligence, be given to them, to the end that such subsequent insurance may be indorsed on the policy made by this company, or otherwise acknowledged in writing ; in default whereof, such policy shall thenceforth cease and be of no effect. And in case of loss, this company shall be liable for such ratable proportion of loss or damage happening to the *subject* insured, as the amount insured by this company shall bear to the whole amount insured thereon, without reference to the dates of the different policies."

In the suit at law, the court decided, —

1. That the circumstance of the early policies being held by mortgagees did not, of itself, dispense with the necessity of a notice by Carpenter.

2. That the misrepresentation to the American Insurance Company did not, of itself, make the policy absolutely void, so as to dispense with the necessity of notice.

3. That, at law, whatever might be the case in equity, mere parol notice of the insurance made in the American Insurance Company was not, of itself, sufficient to comply with the requirements of the policy declared on ; but that it was necessary, in case of any such prior policy, that the same should not only be notified to the company, but should be mentioned in or indorsed upon the policy ; otherwise the insurance was to be void and of no effect.

Under this decision, the plaintiff, Carpenter, having lost his suit, filed a bill on the equity side of the court, averring that in December, 1836, and December, 1837, and at divers other times, the Providence Washington Insurance Company had notice from Wheeler & Co. of the insurance at the office of the American Insurance Company, and that said notices were given for the purpose of having the same indorsed on the policy at the office of the Providence Washington Insurance Company, or otherwise acknowledged by them in writing. The bill further averred, that it was the duty of said insurance company to have indorsed said notice upon said policy at their office, or to have otherwise acknowledged the same in writing. The prayer of the bill is recited in the commencement of this statement.

The defendants filed an answer and an amended answer. In the amended answer, they deny that said policies of insurance, or

either of them, executed by the said American Insurance Company, and bearing date the 12th day of December, A. D. 1836, the 14th day of December, A. D. 1837, and the 11th day of December, A. D. 1838, were notified to these defendants in any form, or that these defendants had any knowledge or suspicion of the existence of said policies, or either of them, until long after the execution, by these defendants, of the policy of the 27th day of September, A. D. 1838.

They then aver, that they executed said policy of the 27th of September, A. D. 1838, in entire ignorance of all said policies at the said American Insurance Office, and in the full belief that the said policy by these defendants was all the insurance which the said plaintiff had on the property insured.

They object to the admission of any evidence that said policies by the said American Insurance Company, of the 12th of December, A. D. 1836, and the 14th of December, A. D. 1837, were notified to these defendants, except the mention of said policies in the policy executed by these defendants, or the indorsement of the same thereon ; and also object to the admission of any evidence that said policy executed by the said American Insurance Company on the 11th day of December, A. D. 1838, was notified to these defendants, except the indorsement of said notice on said policy of the 27th of September, A. D. 1838, or an acknowledgment by these defendants in writing of such policy.

The answer then sets out specifically the misrepresentation under which the American Insurance Company had executed the policies of 1836, 1837, and 1838, and claims the benefit of it, alleging that if notice had been given to the defendants of these policies, their existence, coupled with the representations which had been made, would have led the defendants to believe that both policies would have left a sufficient proportion of the property at the risk of the owner, and consequently they would have had no objection to executing the policy of the 27th of September, 1838, or to indorsing a notice of the policy of December 11, 1838, upon their policy.

The answer then pleads the former verdict and judgment in bar

Amongst other evidence taken in the cause were the depositions of Samuel G. Wheeler, a former owner of half the mill, Allen O. Peck, secretary of the American Insurance Company, and Warren S. Greene, the secretary of the Providence Washington Insurance Company from October, 1836, to that time.

Wheeler deposed, that he caused insurance to be effected upon the property in December, 1836, at the American Office in Providence ; that there was a preëxisting policy in the office of the Providence Washington Insurance Company ; that he gave notice, by letter, to the late president of the latter company, Mr. Jackson, of the insurance effected in the former about the time when it

was done, viz. in December, 1836 ; that he had no copy of the letter ; that the recollection was distinctly on his mind that he did write such a letter ; that he was an agent for the Providence Washington Office, and well acquainted with the terms and conditions of a policy of insurance, and of the necessity of giving notice.

On his cross examination, he stated the contents of the letter to be a notice of the insurance of $ 6,000 at the American Office, with a request that the necessary entry should be made on the books of the company ; that he could find no letter from Mr. Jackson, in reply ; that he had not any distinct recollection of having received a reply ; that he had no business of his own which required a clerk, and therefore employed none for himself ; that his impression was, that he put the letter into the post-office, but could not say positively ; and in reply to an interrogatory why he did not take a copy of the letter to Mr. Jackson, answered as follows.

*Answer.* " The first reason is, which may have operated on my mind, that I did not at that time know that it was necessary to get from the office an acknowledgment in writing that notice had been received. I supposed it only necessary to make the communication in the usual way. And the other was, that after I removed to New Jersey, my correspondence was so limited, that I did not always take copies. ; sometimes they were copied by members of my family; sometimes I copied minutes only, and sometimes did n't copy at all."

Allen O. Peck being sworn, and shown the letter from Samuel G. Wheeler to him, dated December 13th, 1837, and a copy of his reply, dated December 14th, 1837 (above referred to), testified, that it was the common practice to carry letters of this nature to the Washington Office ; that he recollected distinctly having an interview with Mr. Jackson, president of the Washington Insurance Company, upon the subject, at the Washington Office ; and that he had no doubt that he did carry the letter from Samuel G. Wheeler, of December 13th, 1837, to the Washington Office, and show the same to Mr Jackson ; but he had no recollection of so carrying said letter, or handing it to Mr. Jackson ; that his impression that he did carry said letter, and present it to Mr. Jackson, is derived from the fact that it was his custom to communicate such information in that way ; that whatever communication was made, was made to Mr. Jackson ; that the representation referred to in the first letter of Samuel G. Wheeler to the American Office, as being in the Washington Office, was obtained by him from the Washington Office for examination ; that whatever communications were made by him were made to Mr. Jackson, he being the active organ of the company ; that he had no doubt he did show the letter aforesaid to Mr Jackson, but that he had no recollection, of having

done so, and that the statement he now makes, that he did so, is founded on the fact that such was his practice in similar cases ; that Mr. Jackson died in April, 1838.

Warren S. Greene deposed that there was no record, memorandum, or notice on the books, records, or papers of the Providence Washington Insurance Company of insurance on the Glencoe Mill by the American Insurance Company ; that Mr. Jackson, late president of the office, died on the 18th of April, 1838, having been confined to his house by sickness between two and three weeks ; that he was not confined *so as to keep him away from* his business till his last sickness.

The complainant took the depositions of Joseph Strong, Richard A. Reading, Edward W. Laight, and Lewis Phillips, of the city of New York, and Joseph Balch and Charles W. Cartwright, of Boston, as to the usage and practice of insurance companies, who testified that it was not the practice of their or other offices, after notice of a policy upon the same property at another office, to require notice of the renewal of such policy at such other office. To cross interrogatories, these deponents replied, that notice should be given in the manner prescribed in the policy, and that where such notices were verbal they were not sufficient, unless some memorandum of them was made on the books of the company ; that the practice of not requiring notice of the renewal of other insurance was confined to cases where the original notice was given in the mode prescribed in the policy.

At November term, 1843, the cause came on for hearing, upon bill, answer, and the testimony, when the court decreed that the bill should be dismissed, with costs.

From this decree, an appeal brought the case up to this court.

The case was submitted on printed arguments, by *Mr. Whipple* and *Mr. Wood*, for the appellant, and *Mr. R. W. Greene* and *Mr. Sergeant*, for the appellees.

As the decision of the court turned upon the sufficiency of the proof of the fact that notice was given to the company, the arguments of counsel upon other points are omitted.

*Mr. Whipple*, for the appellant, stated the case, and then proceeded.

The whole case (with the exception of something about the merits having been tried at law) is involved in the above extracts from the answers, and they present two questions. First, Is there sufficient proof of the fact of notice ? and, secondly, If there is, will the misrepresentation at the American Office have the same effect as if it had been made at the Washington Office ? The last is in the nature of a preliminary question, and entitled to the earliest attention.

(The argument upon this point is omitted.)

The great, and I consider the only, question in the case is the sufficiency of the evidence to establish the fact of notice to the Washington Office previous to September, 1838 (the date of the last and existing policy sought to be reformed), of the existence of a previous policy at the American Office upon the same property. I say a previous policy at the American Office, because there never was but one policy at that office, the policy of the 12th December, 1836. No new policy was ever effected, but that policy, that insurance, was renewed on the 14th December, 1837, by a renewal receipt, and again renewed in December, 1838.

The representation of December, 1836, extended to all subsequent renewals, because it was the same insurance.

The clauses in the policy now in dispute require that notice shall be given of " any other insurance" prior to or subsequent. If notice had been given to the defendants of the policy at the American Office of the 12th December, 1836, and indorsed upon the policy of the defendants, it would be a strained construction of the words " any other insurance," to extend them to subsequent renewals of the same policy. Without any previous knowledge of their opinions or practice, the plaintiff has taken the depositions of the most experienced underwriters in Boston and New York.

The interrogatories propounded are in page 70 of the record. By the answers of Joseph Balch and Charles W. Cartwright, it appears, 1st, that notices are usually verbal ; 2d, that it is the practice for the office to note the notice on the margin of the policy ; 3d, that it has not been the practice to require notice of the renewals of policies.

By the depositions of Strong, Phillips, Reading, and Laight, it appears, 1st, that notices are usually verbal ; 2d, that it is considered the duty of the office either to reject the proposition and cancel the policy, or to make the indorsement on the books of the company or on the policy ; 3d, that it is not the practice in New York to require notice of a renewal.

It further appears by the depositions, that it is not the practice in New York or Boston to make such a defence, unless in cases of a well grounded belief that fraud has been practised.

The defendants have not attempted to establish any different practice or usage in Providence. Here, as everywhere else, these notices are usually verbal.

Mr. Reading says, — " When notice is given of another policy, we receive or reject it. If we reject it, we cancel our own policy. If we accept it, we require no notice of the renewal."

I have referred to the answers to the cross interrogatories by the defendants. The answers to the direct interrogatories are equally strong and conclusive.

The prayer of our bill is for a " decree compelling said com-

pany to indorse said notice on said policy, or otherwise acknowledge the same in writing, according to the terms of their policy, as they long since ought to have done," &c.

In the first place, it is not a bill to reform a written instrument. We do not ask that one line or one letter of the policy of September, 1838, should be altered, or differently interpreted from the usual meaning of the words. We do not say that something was omitted which ought to have been inserted, or something inserted which should have been omitted. The policy reads as both parties supposed it read, and means what both supposed it meant. No accident or mistake has prevented the exact meaning and intention of both the parties from being fully and fairly expressed.

In bills for reforming written instruments, the proof is required to be much stronger than in ordinary cases, because there is always a presumption, a very strong presumption, that an instrument which has received the examination and scrutiny of both the parties fairly embodies the meaning, and the whole meaning, of both the parties. In cases of this sort, says Mr. Justice Story, in his Commentaries on Equity, vol. 1, pages 168 and 169, the rule is, that the fact must be " clearly made out by satisfactory proofs." Relief will be refused, says the same learned writer, " whenever the evidence is loose, equivocal, or contradictory, or is in its texture open to doubt, or to opposing presumptions."

These and other rules of construction laid down by the same learned writer are all founded in great good sense, and illustrate most fully the wisdom of this branch of the law. As you increase the presumptions against the relief sought, you increase the necessity for proof strong enough to overcome them, just as a head wind and tide require more nerve and vigor at the oar.

Every case cited by the author in relation to insurance were attempts to alter the original policy. Every bill to reform a written instrument or contract is a bill to alter the contract. But the present is more like a bill for the specific execution of a contract. It goes not behind, but in front of, the contract. It requires a party to fulfil what he agreed to fulfil in this very contract. The company agreed that, upon receiving notice of any other insurance, they would assent or dissent. If the former, that they would enter their assent upon the policy or in some other writing. If they dissented, that they would notify us and cancel their policy. Instead of undoing what has been done, the object of our bill is to compel the other party to do what he has left undone. He has contracted to do certain things upon our giving a certain notice. The contract specifies no form of the notice. It may be in writing or verbal. It may be formal or informal. All that the underwriters require is, that in case of any prior or subsequent insurance, the insured will let them know it.

It is like all other liabilities depending upon notice, — the liabil-

ity of an indorser or other surety in special cases, — like all other liabilities, throughout the whole range of human transactions, which are dependent upon the happening of some contingency. When the ordinary evidence is given and not contradicted, the evidence which is usually given of such contingency, the liability becomes fixed, unless that proof is opposed by counter proof. I say counter proof, because, unlike the bill to reform a written agreement, there are no counter presumptions. Giving notice is an act *in pais*. The law neither presumes that it was or was not given.

Many a poor wretch has swung upon the gallows without half the evidence that we have presented. Many and many a conviction has been had, directly against the legal presumption of innocence, upon evidence not half as precise and direct, nor proceeding from men of half the character and intelligence.

I do not perceive why this office, with so many years' premiums in their pockets, paid by my unfortunate client, should be entitled to stronger evidence than is usually given of such facts.

This brings us to the question of the evidence itself. The party who gave the notice was Samuel G. Wheeler, who became a purchaser in October, 1836, and parted with all his interest in the property on the 6th of December, 1837. On that day he conveyed his moiety to Jeremiah Carpenter, the present plaintiff. The policy at the American Office was effected by Wheeler on the 12th day of December, 1836.

In the first place, then, it must be admitted that Samuel G. Wheeler was aware of the necessity of giving notice, and that he had no design to conceal the existence of the policy at the American Office. In both his depositions, he states that he then was and for a long time had been the agent of the Washington Office to procure policies for them in New York and elsewhere.

This agency is admitted, consequently his knowledge of the necessity of notice is admitted.

In the second place, he had no design to conceal the second policy, for in his first application to the American Office (see his letter of 14th November, 1836, and letter of Thornton in reply), he refers Mr. Thornton to the Washington Office for a description of the property. Mr. Thornton in his reply says, — "The survey at the Washington Office was examined." It would be preposterous, after this, to pretend that Wheeler did not intend to give notice of the second policy. Had he intended a fraudulent concealment of an over insurance, he would have applied to an insurance office in a remote State, and not under the very eye of the defendants, referring to them for information.

Two facts, then, must be admitted ; 1st, that Wheeler knew of the necessity of giving notice, and that he intended to give it. Accordingly we find the positive testimony of Wheeler, —

" I gave a notice, by letter, to the late president, Mr. Jackson, about the time the insurance was effected, in December, 1836."

And again : —

" The recollection is distinctly on my mind at the present moment that I did write such a letter."

In his cross examination he says, —

" It was a notice of the insurance of $6,000 at the American Office, with a request that the necessary entry should be made on the books of the company." " My impression is, that I put the letter into the post-office myself."

But this is not all. On the 13th of December, 1837, he wrote to the American Office that he had sold his half of the mill to Jeremiah Carpenter, and requested a renewal receipt to him. He also says, —

" There is insurance on this mill at Providence Washington Insurance Company for $15,000. Will you be so kind as to notify them of the change of owners, and when you write to Mr. Carpenter state to him that you have done so."

On the day succeeding, the secretary of the American Office wrote to Carpenter, that

: " I have notified the Providence Washington Insurance Company that Mr. Wheeler has disposed of his interest to you, of which they have made record. This company have made a similar record."

It seems that, out of greater caution, Wheeler, on the same day, 13th December, 1837, wrote a similar letter to the Washington Company.

Mr. Allen O. Peck, secretary of the American Insurance Company, swears, —

" That it was the common practice to carry letters of this nature to the Washington Office ; that he recollected distinctly having an interview with Mr. Jackson, president of the Washington Insurance Company, upon this subject, at the Washington Office ; and that he had no doubt that he did carry the letter from Samuel G. Wheeler, of December 13th, 1837, to the Washington Office, and show the same to Mr. Jackson ; that his impression that he did carry the letter and show it to Mr. Jackson is derived from the fact that it was his custom to communicate such information in that way ; that whatever communication was made, was made to Mr. Jackson."

He again repeats, at the close of his deposition, —

" That he had no doubt he did show the letter to Mr. Jackson, but that he had no recollection of having done so."

It seems, also, that Mr. Peck was the man who went to the Washington Office in November, 1836, to obtain the representation of the property, and that he borrowed it for the use of the American Office.

Upon this proof, can there be any reasonable doubt that notice was given?'

Wheeler swears to the fact unhesitatingly. His whole subsequent conduct was based upon the belief that notice had been given. It is certain that he intended to give notice, for he referred the American Office to the representation of the property at the Washington Office, in December, 1836. His testimony is not only unimpeached, but it is not even brought into question.

Then it is also certain, that Wheeler wrote the letter of the 13th of December, 1837, requesting the secretary of the American Office to notify the Washington Office of the change of owners. It is equally certain that Mr. Peck, then a clerk in the American Office, did go to the other office, and did have an interview with Mr. Jackson upon that subject. He swears that he recollects the interview distinctly. Suppose he had stopped here, would not the evidence of notice have been sufficient? Was it ever known that an officer of one office went to another to give notice of a change of owners, unless there were policies upon the same property in both? Mr. Peck swears that he very often went upon such errands, but he does not swear to an instance unless both offices were upon the same property.

But Mr. Peck goes further, and swears that he has no doubt that he read or showed the letter to Mr. Jackson, because such was the custom, such his practice. Mr. Peck must mean that such was his invariable custom; for if he sometimes showed the letter and sometimes kept it back, he could not swear that he had no doubt in relation to the fact in this particular case. Do we not all know that it is an invariable custom? When mercantile information is requested to be communicated to others, and the person receiving that information takes the letter with him for the sole purpose of communication, and carries it, not in his pocket-book, but in his hand, are we to suppose that he would depart from an established custom, and neither read or show the letter?

It must be remembered that all the other statements or facts are certain. That he did go there is certain, because the contemporaneous correspondence shows it. That he had no other business there, that he started with this letter in his hand, that he had an interview with Mr. Jackson upon this business, is all certain; that is, it is legally certain. It is sworn to by an honest and disinterested witness, whom no man has yet doubted.

The court will observe that Wheeler, in his letter to the American Office, of the 13th of December, 1837, does not request the secretary to give notice to the Washington Office of the existence of a policy at the American Office. He acted, in December, 1837, upon the belief that he had given that notice in December, 1836. His not giving that notice a second time is a confirmation of his testimony that he did give it in 1836, because he must have

known that the fact of an officer of the American Office (who had been there before for a statement of the property) going to notify a change of owners would necessarily imply that there was a policy at the American Office. This silence about the American policy proves that Wheeler, in December, 1837, had no doubt that he had given notice in 1836, because this was before any dispute was apprehended.

When the loss took place, in April, 1839, Carpenter had no doubt that notice had been given of the American policy, for in his preliminary proof forwarded to the Washington Office, he states that the property was insured by both offices.

It will be remembered that the letter of the 13th of December, 1837, which Peck carried in his hand to the Washington Office and showed to Mr. Jackson, contained the statement of the policy at the American Office.

How is this evidence met?

The answer is not evidence for the respondents.

The testimony of a single witness prevails against the denial of an answer sworn to only by a defendant who has no personal knowledge of the facts. Combs v. Boswell, 1 Dana, 474; 3 Eq. Dig. 385–388; Pennington v. Gittings, 2 Gill & Johns. 208; Clark v. Van Riemsdyk, 9 Cranch, 153; Knickerbacker v. Harris, 1 Paige's Ch. Rep. 209.

The answer, then, is most clearly no evidence for the defendants. It purports to be the answer of the Providence Washington Insurance Company. The first answer states that these defendants answer and say, " They never had any notice in any form " of the three policies of December, 1836, 1837, and 1838, at the American Office.

" That the policy of the 27th of September, 1838, was executed by these defendants in entire ignorance of said policy, and of the renewal thereof, executed by the said American Insurance Company."

In the amended answer, they deny that the policies at the American Office " were notified to these defendants in any form, or that these defendants had any knowledge or suspicion of the existence of said policies, until long after the execution, by these defendants, of the policy of the 27th of September, 1838."

This amended answer was sworn to on the 7th of November, 1843.

They do not say, " until long after the loss in April, 1839," but long after September, 1838; and before April, 1839, they had notice of these policies at the American Office. Then these directors, this company, or some of them, admit that before the loss they had notice of the policy at the American Office.

From whom did this notice proceed? At what time? What was the notice to these defendants? Did some one of their own

company tell them that notice had been given by Mr. Peck to Mr. Jackson, in December, 1837 ?

Did not the notice, which by their answer they acknowledge they received before the loss, refer back to 1837? Did it not proceed from the agencies which we had established? From the American Office, or some of its officers? If it proceeded from the agents, it proceeded from us. Why keep back the time and the source and the extent of this information? If a disclosure of the whole truth would not have injured their case, they would have disclosed the whole.

But the amended answer states that they had no knowledge or suspicion of the policies at the American Office, until long after September, 1838.

If such be the fact, it establishes one very important point in the case. It proves that Mr. Jackson was not in the habit of communicating all the transactions of the office, however material to the interests of the whole. If they had no suspicion of policies at the American Office, they remained in entire ignorance of the fact, that in November, 1836, the clerk (Mr. Peck, at that time) went to the Washington Office, at Wheeler's request, and borrowed the representation of the property made to the Washington Office by Egbert Reed & Company, in September, 1835.

Mr. Peck returned that representation. They were ignorant of that also. Mr. Jackson knew of this. Mr. Greene, the witness, knew of this, for he was the secretary at the time, and probably delivered the paper. He does not swear that he had no suspicion of a policy at the other office until September, 1838. But this answer shows that none of the other members of the company knew of it.

So far as the answers go, they confirm the testimony of the plaintiffs.

The only testimony on the part of the defendants is filled with the same tendency.

Mr. Greene was the secretary of the office from October, 1836, down to the time of giving his deposition.

He swears that there was no letter on file from Wheeler giving this notice, and no copy of any answer to it; and that it was the usage to file and preserve the letters and copies of the answers.

Dabney swears that such was the practice at a preceding period.

The tendency of the evidence is to lessen the weight of Wheeler's deposition. It creates a counter presumption; how strong the court will judge.

But what is very important is, that Peck's testimony has been long known to the defendants. He was sworn as a witness upon the trial at law. Greene was subsequently called, and from that day to this they have never asked Greene whether he was present when Peck carried Wheeler's letter to Mr. Jackson. The sec-

retary is usually at the office from the time of opening to the time of closing its doors. Peck was there the 13th of December, 1837.

Not a question is put to Mr. Greene in relation to this fact. He is not asked when he first knew of the policy at the American Office. If it was important for the new president, Mr. Dorr, who was elected in May, 1838, to state that neither he nor the company ever knew or suspected the existence of these American policies until long after September, 1838, how much more important was it to them that the secretary never suspected their existence at a long anterior period ; the man whose ignorance of their existence would have established a most formidable presumption against the plaintiff.

He says nothing about either of Peck's three visits upon this very business. In the first place he went for the representation, in November, 1836. The paper was in Greene's possession, for he was the secretary. He obtained it, no doubt, from Greene. He returned it to Greene. He had a conversation the next year, during business hours, when Greene must be presumed to have been present.

The defendants long since must have seen that Peck's testimony was upon a vital point of the case. They are at great pains to establish the ignorance of Mr. Dorr, who had no connection with the office at that period ; so great that Mr. Dorr swears for himself and the company, in his first answer, that he never suspected the existence of these policies ; and in the second, that he did not suspect their existence until long after September, 1838 ; and although their swearing, which is not evidence, is deemed so very important, yet the swearing of the man who was a competent witness, and most likely to have heard of the fact, had notice been given, is deemed of so very little moment, that not a single question is put to him upon the subject !

He has been called three times as a witness, once upon the trial at law, in November, 1839 ; once upon this bill, on the 11th of November, 1843, when he was asked, whether there was any entry of notice upon the books of their office ; and again, as late as the 16th of January, 1844.

Upon neither of these occasions have the defendants hazarded the question, what passed between Mr. Peck and Mr. Jackson, nor the question, when he first knew of the policies at the American Office. He was their witness, and they asked such questions only as would elicit favorable answers.

To be brief, then, in the mere opening of this important case, we do say, and say earnestly, that the answers and testimony of the defendants go strongly to confirm the testimony of Peck.

Our claim to the entry of this notice upon the policy, together

with a claim for relief under this bill, will be more properly enforced in the closing argument.

We suppose the real truth of the case to be, that it was wholly and entirely owing to the neglect of Mr. Jackson that the entry was not made in the books of the company. In December, 1837, he had reached an advanced age. Though he did not wholly retire from business until March, 1838, yet it is well known that he had been out of health for a long period, and consequently more indifferent to all business concerns. Had Mr. Jackson been living and in health in September, 1838, when the policy was renewed, some entry would have been made. When he received notice, he probably deferred any action upon it until more information was obtained. The renewal of the policy found a new president, and the company took a new premium for another year, with notice of a policy at another office. Can this be permitted ?

*Mr. R. W. Greene* and *Mr. Sergeant,* for the appellees.

The bill charges, " that in the month of December, A. D. 1836, and in the month of December, 1837, and at divers other times, the said Providence Washington Insurance Company had notice of the said insurance at the office of said American Insurance Company, and that said notices were given for the purpose of having the same indorsed on the policy at the office of the said Washington Insurance Company, or otherwise acknowledged by them in writing."

The defendants deny that they have received notice of these policies in any form, either by writing or parol ; and we will proceed, in the first place, to consider this question upon the evidence which is in the cause, assuming, for the purposes of the present argument, that this evidence is admissible ; and not now inquiring whether, even if it were proved, it constitutes a ground of equity upon which this court can proceed.

The only evidence in the cause to prove notice of the policy of December, 1836, is the deposition of S. G. Wheeler. The report of his testimony, contained in the bill of exceptions, is not evidence in the present suit.

He states in answer to the fourth direct interrogatory, — " I gave a notice by letter to the late president, Mr. Jackson, about the time the insurance was effected at the American Office, in December, 1836."

In answer to the ninth cross interrogatory, — " Did you put said letter in the post-office yourself, or send it by some third person ? " — he says, " My impression is, that I put it in the post-office myself, but I cannot say positively."

This evidence totally fails to prove even that a letter was deposited in the post-office. The witness says, in terms, that he can-

not say positively that he did put it in the post-office, though his impression is that he did so.

Suppose these defendants were sued as the indorsers of a promissory note, and the defence was want of notice. The rule in such cases is not, that the holder of the note is bound, at all events, to give notice to the indorser, but he must use reasonable diligence to do so ; and if, notwithstanding reasonable diligence, the indorser does not receive the notice, that is his misfortune, and constitutes no defence against the note. It has accordingly been decided, that if the holder put a letter in the post-office at the proper time, and properly directed, giving the indorser notice, this is enough, although the letter may never be received. But this deposition of Wheeler does not bring the case even within this rule. The deposit of the letter in the post-office is not proved. The witness merely gives a loose impression, six years after the date of the transaction, and after the loss has happened.

By the clause in the policy of the defendants, requiring notice of prior and subsequent insurance, the insured is bound at all events to give notice to the defendants, and to bring it home to their knowledge. Whether any other evidence except that agreed upon in the policy can be received, that is, whether the contract can be altered from its own express terms, so as to make it a different contract from the one expressly agreed upon, is another question, to be considered hereafter ; but assuming for the present that the evidence is admissible, it must nevertheless prove actual notice brought home to the defendants. And in a case where the parties have agreed in the policy upon written evidence as the only proof of notice, the court, if they were to admit parol proof at all, would at least require that this proof should be clear and positive. Even if the deposit of the letter in the post-office had been proved beyond all doubt, it would only have furnished a presumption of its receipt by the defendants, liable to be rebutted by counter proof. In the case of a note or bill, the party is only required to use due diligence, which is defined by law. But here, by his own express agreement, he is to give the notice, so that the underwriter may act upon it. And it is most clear, that nothing is notice, according to the policy, which does not so reach the insurer that he can give it an answer. To send a notice is not enough. No diligence is enough. The contract is not to use diligence, but to give the notice effectually. If a hundred notices were sent, and no one of them reached the insurer, the case of the policy would not be made out.

There are many circumstances connected with this letter, which show that Mr. Wheeler must be mistaken in supposing that he wrote it.

No copy of it was taken. The counsel for the plaintiff says Wheeler was fully aware of the importance of this notice, and was

determined to give it. In answer to the seventh direct interrogatory, he says : — " After retiring from business, in August, 1836, and removing from New York to New Jersey, I did not always take copies of my letters. I would sometimes take copies of the leading points ; and at other times did n't take copies at all."

Here was a letter involving the safety of a policy for $ 15,000 of property, of the importance of which, it is said, he was fully aware. It must necessarily have been brief, not more than two or three lines. One would suppose that Mr. Wheeler would, at least, have taken a copy of the leading points of so important a communication. When in business in New York, he says he had a clerk who always copied his letters, and when in New Jersey he had no regular clerk for himself. This witness is a shrewd business man, accustomed to business correspondence, aware of the importance of preserving copies of his letters, and was in the habit of taking copies of some of his letters at the time he says he wrote this.

Of this brief but important letter, it seems, he did not think it worth while to take a copy himself, or even minutes, or to request any one of his family to do so for him.

By the twentieth cross interrogatory, he is asked why he did not take a copy of this letter, being the same question which had been put by the seventh direct interrogatory.

He says, in answer : — " The first reason is, which may have operated on my mind, that I did not, at the time, know that it was necessary to get from the office an acknowledgment in writing, that notice had been received ; I supposed it only necessary to make the communication in the usual way." How can this be ? The same clause in the policy, which requires the notice, prescribes the mode in which it is to be acknowledged. This reason was discovered between the time of answering the direct and the cross interrogatory. In the policy at the American Office, the Washington Office policy is mentioned, in strict conformity to the provision of the American Office policy, which is similar to the provision in the Washington Office policy.

But aside from this, Wheeler knew that notice was at least important, whether acknowledged in writing or not, and would he not have preserved so important a piece of evidence of the fact of notice as a copy of the letter containing it ?

Again, he received no letter from Mr. Jackson in reply.

Why did he not write again ? He knew that such a letter, if received, would be answered by the Washington Office, according to their invariable practice ? Again, why did he not inquire of Mr. Jackson, the president of the company, about this letter when he next saw him ?

The papers in the case show, that Wheeler was a man of unusual caution and care in business. The changes of property were

all promptly and duly notified to both offices. The sale of his half of the mill to the present plaintiff, Carpenter, was notified to the Washington Office by letter, dated December 13, 1837. Not satisfied with this, which was the usual mode, he on the same day, in a letter to A. O. Peck, notifying the American Office of the same sale, requests Peck to notify the Washington Office of the change of owners, and when he wrote to Carpenter, to inform him that he had done so. All this care is taken for his son-in-law and brother, but for himself he is content to write a letter ; he is not certain that he put it in the post-office himself ; he takes no copy ; although he received no reply, he never wrote again, nor, when he met the president, made any inquiry about the matter, and never knew whether it was received or not.

We think these circumstances show that Mr. Wheeler is mistaken in his recollection, when he says he wrote such a letter. We should have been better satisfied with Mr. Wheeler's testimony, if he had produced to us his letter-book, by which we could see whether copies of letters written at and about this very time were not taken.

But however this may be, we submit to the court there is no proof whatever that such a letter was ever put in the post-office. And we might safely leave the cause upon the plaintiff's proof alone.

But how stands the counter proof ?

In the first place, notice is denied in the original and amended answer in the most positive form.

The answers are sworn to by Sullivan Dorr, the president of the company, who was such at the date of the policy of September, 1838, and for some time before. All who know Mr. Dorr will agree with me in saying he is incapable of making, still less of swearing to, a statement which he does not conscientiously believe to be true.

The plaintiff's counsel cavils at the difference between the two answers in the mode of denying notice.

The amended answer was made for the purpose of setting up the judgment at law as a bar to the plaintiff's bill, and not to alter the allegations of the first answer, denying notice.

Both answers deny that notice was ever given to the defendants, in any form, of said policies, or either of them.

Both these statements are true. They never had notice in the sense of the policy ; that is, notice to be indorsed or acknowledged. They never knew or heard of the policy at the American Office until after the loss ; then the policy at the American Office necessarily became public, and in the first proof of loss presented to the Washington Company, the insurance at the American Office is stated.

In another part of the amended answer, it is stated that the said

policies at the American Office were not notified to the defendants in any form, or that the defendants had any knowledge or suspicion of the existence of said policies, or either of them, until long after the execution by the defendants of the policy of September 27th, 1838.

This difference was without any design. The counsel who drew the answer supposed it was sufficient to deny notice until long after the policy on which the defendants are sued was executed. If the defendants executed the policy of September, 1838, without ever having received any notice of any policy at the American Office, and in entire ignorance of the fact of any such policy, that is fatal to the plaintiff, and it was not material at what time after that the defendants came to the knowledge of the further insurance. It is not pretended that the defendants had any notice or information of the policy at the American Office after they subscribed the policy of September, 1838. The plaintiff must have but a slight foundation for his claim of notice, when he attempts to draw aid from such an answer.

But throwing the answer aside, let us consider the proof of the defendants.

Warren S. Greene, a witness on the part of the defendants, states: — " That he had been secretary to the Washington Insurance Company since October, 1836 ; and that no letter was received from Samuel G. Wheeler, giving notice of the insurance at the American Office, and that from the course of business in said office he must have known it, had any such letter been received ; that he could find no letter from Samuel G. Wheeler to the Washington Insurance Office, giving notice of the insurance at the American Office, and that there is no record at the Washington Office of further insurance at the American Office, and that there was no copy of a letter acknowledging information of the policy at the American Office ; that the invariable practice of the office was, when notice was received of any subsequent insurance, for the directors to take the same into consideration, and to give an immediate answer to the insured, whether or not they consented to the indorsement of such subsequent insurance on the policy. That it was also the invariable practice of the office carefully to preserve all letters by them received, and also to keep copies of all letters by them written."

Charles H. Dabney, predecessor of Mr. Greene, confirms his testimony in relation to the usages of the office.

If Wheeler had sworn positively that he put a letter in the post-office, directed to the President of the Washington Insurance Company, at Providence, containing the notice of the insurance at the American Office, it would at most but furnish a presumption that the letter was received, — a presumption liable to be overthrown by proof that it was not received. We have, on this point,

the positive testimony of the secretary of the company, whose duty it was to take all letters from the office directed to the company, to file all letters received by the company, and to preserve copies of all letters written by the company. If such a letter had been received, he must have known it. He says : — " There is no record, memorandum, or notice on the books, records, or papers of that office, of insurance on the Glencoe Mill by the American Insurance Company."

His testimony is confirmed by the fact, that the directors were never called together, nor any consultation had, in relation to any such letter. It is confirmed further by the fact, that no letter was ever written to Mr. Wheeler in reply, either consenting to the further insurance, or objecting to it.

It is, too, utterly incredible that the directors of this company, if such a letter had been received, should not have taken some action upon it. They had already insured the property to the amount of $ 15,000, the largest amount taken upon any one mill, and they had insured it to within three fourths of the value put upon it by the owner, which, it is well known, is always a liberal estimate, and one they did not exceed. Three fourths is the largest amount which the company insures upon manufacturing property, or deems admissible to be insured upon it, by one or by several companies, as is fully proved.

The usage of the office, like that of every well regulated institution, was, and is, to insure from two thirds to three fourths of the value. Now it is utterly incredible that these directors should have remained satisfied with a further insurance on this property to the amount of $ 6,000, both policies exceeding the value of the property as estimated by the owner himself, and making an amount so inconsistent with the policy of the company. And the court will perceive, that when Wheeler applied to the American Office, referring them to the representation made at the Washington Office for the description and value of the property, they refused to insure at all, — deeming, as they say, the amount insured by the Washington Office as much as was safe to underwrite upon the property.

The only supposition which could render it at all credible that these directors would have consented to the further insurance is, that upon the receipt of the letter, they went and examined the representation at the American Office, and conferred with the directors of that office, and found that $ 10,000 additional property were represented to have been put upon the estate. Had this been the case, such conference and examination could have been proved by the directors of the American Company. But the truth is, no such letter was ever written ; if written, there is no proof that it was put in the post-office ; and, if put in the post-office, we prove most conclusively that it was never received by the Washington Insurance Company.

Carpenter *v.* Providence Washington Ins. Co.

We will not, in this stage of the cause, stop to consider the legal question, as to the effect which such notice would have, if actually received, upon the policy of September, 1838. But we will respectfully ask the attention of the court to the precise agreement of the parties, which is, that all shall be in writing. The court will no more vary the contract on the equity side than on the law side, nor give it an interpretation different from the plain import of the words, when the words are free from ambiguity and doubt. That would be to make a new contract, — a power which a court of equity never assumes. It is not incumbent upon the defendants to show why this part of the contract is in the terms which are used, nor to vindicate its propriety. The fact, that it is a part of the contract, is enough, as was said by this honorable court in the judgment at law. Its requirements are not impracticable, nor even difficult to be complied with ; but the very precision and accuracy of the terms in which the clause is conceived are evidence of the value set upon it by both the parties, and so is the express, deliberate agreement, that every thing shall be in writing, and nothing be trusted to parol. This court is not, however, insensible to the importance of the clause, nor of the offices it has to perform, which were fully recognized in the opinion at law. In the first place, it makes the law in case of several insurances, between the insured and the underwriter, and between the several underwriters, because it furnishes the evidence upon which the law arises. This evidence, therefore, must be certain and permanent, as the other parts of the policy, and not left to depend upon uncertain recollection, or liable to be affected by motives of interest or bias. In the next place, it is indispensably necessary to protect against fraud, being the only security against excessive insurance, often made with fraudulent intention, and always a temptation to fraud. And, finally, without going into all the numerous considerations connected with the matter, it is to cut off, by the policy itself, such questions as it is attempted here to raise, the tendency of which to produce confusion and embarrassment is so manifest in the present case.

If the evidence were even more satisfactory than it is, — if it were not so completely contradicted, — still what does it tend to prove ? Not a compliance, most obviously. It proves, on the contrary, a non-compliance, and asks of this court to dispense with that part of the contract which has not been complied with, upon no other ground than that it has not been complied with.

The next piece of evidence relied upon by the plaintiff to prove notice is the testimony of Mr. A. O. Peck, in connection with the letter of S. G. Wheeler to him, of December, 1837.

This testimony applies to the policy of December, 1837. The argument, on the part of the plaintiff, is, that Mr. Peck showed this letter to Mr. Jackson ; that, consequently, Mr. Jackson must

have known there was a policy on the Glencoe Mill at the American Office.

In the first place, Mr. Peck states, that he has no recollection of showing this letter to Mr. Jackson, and his statement that he did·so is founded entirely upon his practice to do so in like cases. The whole strength of the evidence, then, consists in the presumption derived from Mr. Peck's usual habits of business in this particular. The thing which he was requested to do was no part of his official duty. It was a matter of favor to Wheeler, to be done in a manner most convenient to himself. It would rest,·therefore, entirely in his own caprice, whether he would make a verbal communication to Mr. Jackson, or whether he would ·hand him the letter. Ordinarily he would find it more convenient, perhaps, to hand the letter, than to make a verbal communication, unless that communication were brief, which was the case with the matter to be communicated here. But the presumption derived from the usage of an individual, in relation to matters of this sort, has none of the strength of a presumption derived from usages ·in relation to official acts, such as the making record of changes of owners of property insured, or of notices of other·insurance, of preserving files of all letters received, and copies of· all letters written by the insurance company, and of replying to all letters received which require a reply.

Now· we oppose to the presumption derived from Mr. Peck's usages, the usage of. Mr. Jackson,· president of the Washington Insurance Company, to act upon all notices of further insurance upon the same property ; if the further insurance was subsequent, to call the directors together, and decide whether to assent or dissent, and to give prompt reply to the insured.

Mr. Jackson is well known in this community to have been remarkable for promptitude, sagacity, and fairness in the discharge of the duties of his office, an office which ·he held for more than thirty years. No one knew the merits of his character more thoroughly, in all these particulars, than the learned counsel who has made the opening argument for the plaintiff. But in this argument, we claim for Mr. Jackson nothing more than the presumption which the law would make in his favor, that is, that the duties of his office would be fairly discharged unless the contrary is shown.

We oppose, therefore, the presumption derived from the usages of the Washington Insurance Company and their officers to the presumption derived from Mr. Peck's habits of business ; and we say that the latter is. entirely overthrown by the former. The fact, that no consultation was had among the directors, is conclusive to show that they could not have known of this policy at the American Office. Mr. Peck states, that he recollects distinctly that he had an interview with Mr. Jackson upon the subject, but the

plaintiff's counsel cautiously abstained from asking him what communication he made to Mr. Jackson. The natural presumption is, that he told Mr. Jackson what Mr. Wheeler requested him to tell, which was, that Wheeler had sold his interest to Carpenter in the Glencoe Mill. He could have had no motive to go beyond this. There is, therefore, no proof of any information given to Mr. Jackson of the policy at the American Office, either by the exhibition to him of Wheeler's letter to Peck, or by any verbal communication of Peck himself. The reasonable presumptions are all the other way.

We refer in this connection to the memorandum indorsed upon the record of the policy at the Washington Office, under date of December 15th, 1837 : —

" Samuel G. Wheeler informs by letter to this company, dated Patterson, December 13, 1837, that he has sold his half of the Glencoe Mill to Jeremiah Carpenter. It is, in consequence thereof, agreed, that the risk assumed by this policy for account of S. G. Wheeler continue for account of said Jeremiah Carpenter. The original policy not being at hand, this indorsement is not put thereon.

" RICHARD JACKSON, President.

" WARREN S. GREENE, Secretary."

This memorandum shows that Mr. Jackson acted even with regard to the notice of the change of property from Wheeler to Carpenter, not from any information derived from Peck, but upon the letter from Wheeler himself.

The memorandum also goes to show, that Peck could not have shown Mr. Jackson the letter of Wheeler.

The letter to Peck and the letter to the Washington Company are dated on the same day, December 13th, and on the 14th, Mr. Peck replies by letter to Mr. Carpenter, stating, — " I have notified the Providence Washington Insurance Company that Mr. Wheeler had disposed of his interest to you, of which they have made record."

The record at the Washington Office shows that Mr. Peck must have been mistaken. He might have had the interview with Mr. Jackson informing him of the sale from Wheeler to Carpenter, and Mr. Jackson might have told him that he would make a record of it, but receiving the letter from Wheeler, he naturally referred in his memorandum to the letter of Wheeler to the Washington Company as the more authentic source of information. The insured are required by the terms of the policy to notify the company of all sales of the property insured, and the assent of the insurance company is necessary in order to cover the property for the new owner. This is a provision comparatively unimportant. The insurance company do not rely so much

upon their knowledge of the character of the insured, as upon his interest. They leave a material proportion of the property at his risk. The provision, therefore, with regard to prior and subsequent insurance, is one of paramount importance; and yet the court will perceive that the various changes and sales of this property from 1835 to 1838 are all noted upon the books of the Washington Insurance Company with great exactness and promptitude, but there is no memorandum or indorsement anywhere of these policies at the American Office.

Again, notice of a subsequent insurance must come from the insured, or from an agent authorized to give this notice. It is a notice which binds the insured if assented to by the insurer; and entitles the insurer, in case of loss, to contribution from the subsequent underwriters, each in proportion to the amount of their subscription.

The language of the clause is, "shall with all reasonable diligence give notice thereof to the corporation, *and have the same indorsed* on the instrument, or otherwise acknowledged by them in writing."

The company would not be authorized to make an indorsement upon rumor, incidental information, or upon any information not communicated by the insured himself, or by his authorized agent, nor beyond what he directs to be notified. Now Mr. Peck was Wheeler's agent, not to notify to the Washington Office the policy at the American Office, but to notify to them the sale from Wheeler to Carpenter; beyond that he had no authority. He could give no notice which would bind the insured, and could give no notice that would bind the insurer. What authority had he to call upon the Washington Insurance Company to indorse a notice of the American policy on the policy at the Washington Office, or otherwise acknowledge the same in writing?

But let us look at the letter itself. It states that the policy at the American Office had expired, which was the fact. It is true, he applies on behalf of the new owners for a renewal of this policy, but the letter does not state it was renewed, nor is there any evidence in the cause that information of its renewal was ever communicated to Mr. Jackson, or to any officer or member of the Washington Office, by Mr. Peck, or in any other way. The whole extent, then, of the information contained in the letter is, that there had been a policy at the American Office which had expired, and that the new owners of the property had applied for a renewal. It may be reasonably inferred from the letter, that the policy at the American Office was on a distinct interest; at least it leaves the matter in doubt. The letter states, that the expired policy had been assigned to Epinetus Reed, and requests the company to make the new policy payable to the same individual. Another important fact in relation to this matter is this. The let-

ter from Wheeler to Mr. Jackson, giving notice that Wheeler had sold his interest to Carpenter, is dated on the same day with the letter to Peck. Mr. Jackson might well suppose, that if there was any insurance on this property at the American Office, which was to be notified to the Washington Office, that Wheeler would have stated it in his letter to him.

Again, the bill charges that the notice given to the Washington Insurance Company was given " for the purpose of having the same indorsed on the policy at the office of the said Washington Insurance Company, or otherwise acknowledged by them in writing."

Was Mr. Peck's communication to Mr. Jackson, whatever it may have been, made for the purpose of having it indorsed on the policy, or acknowledged in writing ? If Mr. Jackson read this letter, that part of it which relates to the policy at the American Office was not intended by Wheeler for him, or to be read by him ; — that part of the letter was intended for the American Company, and the American Company only. If Mr. Peck, therefore, verbally or otherwise, made Mr. Jackson acquainted with that part of the letter which related to the policy at the American Office, he did that which he not only had no authority from Wheeler to do, but what Wheeler never intended he should do. If Mr. Peck was a man of business, the presumption is directly the reverse of what is claimed, namely, that he conformed to his instructions, and did not transcend them.

The opening counsel for the plaintiff supposes the real truth of the case to be, that it was wholly and entirely owing to the neglect of Mr. Jackson that the entry was not made upon the books of the company, and attributes his neglect in this particular to his advanced age. He was not much older than the learned counsel himself, and as competent to do business as he ever was in his life. He was careful at this very time to make the proper indorsement of the sale from Wheeler to Carpenter, a matter of no importance compared with the notice of a subsequent insurance. Had Mr. Jackson been living in September, 1838, when the policy sued on was executed, the learned counsel thinks some entry would have been made. Such a presumption is entirely gratuitous. The time to make the entry was when the notice was received. This is proved to have been the invariable practice of the office, and no man was more strict in the observance of its usages than the late Mr. Jackson. Besides, what entry could Mr. Jackson make ? He could only copy the letter, and that merely contains a proposal for further insurance for the new owners at the American Office The notice could not be given till the insurance was made, nor could it be taken till then, nor indorsed on the policy. Mr. Jackson would naturally say, if this proposition be acceded to, the owners will of course give us notice, and as no further information was

given, Mr. Jackson, had he been living when the policy of September, 1838, was subscribed, would have concluded that the proposal for further insurance at the American Office had not been assented to. At all events, he had no right to make the indorsement till such notice was given.

The counsel suggests, that when Mr. Jackson received notice, he probably deferred any action upon it until more information was received. This concedes the whole case. Surely notice was not to be of a character which would leave the insurance company ignorant or in doubt. It was to be explicit and certain. If this letter had been read to Mr. Jackson by Mr. Peck, he certainly could not have acted upon it, for the reasons which have been already stated. He must, as a prudent man, have waited for further information. It was not his fault that the information was not more perfect. The further information never came. There is not a tittle of proof that any information was ever communicated of insurance at the American Office, subsequent to the time referred to in Mr. Peck's testimony.

The learned counsel suggests that Mr. Greene, the secretary of the Washington Insurance Company, must have been present at the interview between Mr. Jackson and Mr. Peck, and must have heard what was said by Mr. Peck. Suppose he had been, he could not have heard any thing more than Mr. Jackson, and there is no reason to suppose that Peck told Mr. Jackson any thing more than Wheeler requested him to tell. The learned counsel complains because the defendants do not ask Greene in relation to this matter. If he supposed Greene knew any thing, or heard any thing, of this conversation, it was his place to have inquired in relation to it. The burden of proof is on the plaintiff, to prove notice to us, being affirmative proof; not on us to disprove it. The plaintiff had an opportunity to prove the verbal communication of Peck to Mr. Jackson, by Peck himself, who was the most proper witness for that purpose ; and yet he has cautiously abstained from making any inquiry of Mr. Peck in relation to this matter, but complains that we did not examine Mr. Greene, to ascertain if he were present, and if he were, what was said.

Again, the learned counsel complains that we did not ask Mr. Greene when he first suspected the existence of the policies at the American Office. We had no right to ask Mr. Greene such a question. The plaintiff might have asked it. This resort indeed establishes, that the ingenuity of the learned counsel, great as it certainly is, was tasked far beyond any man's strength, being required to make a case where none really existed, by suggesting probabilities where there was neither fact nor probability. All the circumstances that ever took place in relation to this matter are in proof.

The American Insurance Company, in the application of

Wheeler, were referred to the representation at the Washington Office for a description and estimate of the property. The plaintiff has not called Mr. Thornton to prove what he said at the Washington Office, when he called there to examine the representation. The probable presumption would be, that if he called there for that representation, that he did so with a view to act upon a proposition to underwrite upon the property. But the Washington Insurance Company would take no notice of such a fact, and it would make no impression upon the mind of the officers, because if the American Company should finally agree to underwrite, the assured were bound to give them notice as soon as the policy was executed. If, therefore, Mr. Thornton, when he went to the Washington Office to examine that representation, had stated to Mr. Jackson, that Wheeler had applied for further insurance, and that he had examined the representation with a view to decide upon the application, Mr. Jackson would have thought nothing of it, because if the negotiation should finally terminate in further insurance, he knew that Wheeler was bound to give him notice. It will hardly be contended, at all events, that this was notice of the policy at the American Office, or that the Washington Office would be at liberty to act upon it. Besides, Mr. Jackson, as an experienced underwriter, and no man was more so, must have felt sure that the American Company would not have made any further insurance upon this property, the Washington Company having already insured the property for more than three fourths of its value.

In point of fact, therefore, if Thornton had specifically stated to Mr. Jackson the purpose for which he called to examine the representation at the Washington Office, it would give Mr. Jackson no reason to believe that the American Company would make any further insurance upon the property, and in fact they did refuse to make any further insurance upon that representation. Besides, it would not be notice, being to a different intent and for a different purpose, that is, to obtain information and nothing more.

The learned counsel, while he complains that we have not inquired of Mr. Greene if he recollects that Mr. Thornton came to the office and borrowed the representation, and what was said by him, was careful not to call Mr. Thornton himself.

One would suppose Mr. Thornton was the best witness to tell what he said, as Peck is to tell what he said, and yet no inquiry is made of Peck, and Thornton is not called. The fact that the secretary of one insurance company borrowed of another a representation would make no impression upon the mind of the secretary or president of the other, even if the motive was stated, because they rely upon notice being given them if the policy should be executed, and have no right to act upon any thing less. Mr. Greene has been under examination as a witness, and if the plain-

tiff thought he knew or suspected any thing with regard to the policy at the American Office, it was in his power to have inquired of him. We have asked him all the questions we had any right to ask him. His character is such, as the plaintiff's counsel well knows, that he would have answered every question with the most entire truth and candor.

The truth is, that he, as well as all the other officers at the Washington Office, were taken entirely by surprise, when, after the loss of the Glencoe Mill, they found the policy at the American Office.

We have now reviewed all the evidence which has been offered on the part of the plaintiff to prove notice of the policies at the American Office. We think, from this review of the evidence, that it is quite apparent not only that the plaintiff has failed to prove notice of the policies at the American Office, but that the defendants have disproved it. The failure to make out what seems to be proposed is just as signal as the insufficiency of the purpose itself. The whole object seems to be to establish, that Mr. Jackson was to perform the complainant's duty as well as his own, to speak for the complainant where he was silent, to understand for him without being told how he wished to be understood, and to act for him without instruction or authority, because, in the event, it appears to have been for the interest of the complainant that he (Mr. Jackson) should have so spoken, understood, and acted.

*Mr. Wood*, for the appellant, in reply and conclusion.

I propose, in this reply, not to repeat the arguments advanced in opening the case.

I shall attempt to establish the following propositions : —

1st. That the Washington Company, who are the first insurers, had notice of the second insurance in the American Office.

2d. That this notice, under the circumstances of this case, is sufficient to bind them in equity to pay for the loss under their policy.

There are a few miscellaneous topics discussed in the close of the respondent's argument, which I will first dispose of.

It is said that the complainant had his election of two remedies, — one at law, the other in equity, — and that having first selected the common law remedy, he is precluded from going into equity for relief.

This would be true in a case where the two tribunals have concurrent jurisdiction. But it does not apply to a case like the present, where the common law court has no relief to give, and the party in going there mistook his remedy.

Where a party mistakes his remedy at law, and fails on tha ground, he may still, at law, resort to the appropriate remedy and recover.

It was proper in this case to try the remedy at law first. Because, although the relief sought is strictly equitable, yet of late years common law courts have extended their remedies in many cases so as to embrace what is strictly equitable relief.

This court, however, has shown a disposition to keep the remedies in the respective courts distinct, and we therefore abandon our former ground, and resort to the equity side of the court. The learned justice intimated, in no equivocal language, that we had, in the first instance, mistaken the proper forum.

It is said we can get no relief in equity different from law, on a bill for specific performance. That will depend on circumstances and the character of the relief sought. We do not ask the court to put upon the contract an interpretation different from the common law court. But we seek relief, under the equitable circumstances of this case, against certain requirements, which the rigid rules of the common law will not dispense with, but which in equity will be dispensed with, when, by an adherence to them, they will become an engine of fraud.

If we have made out such a case, equity will relieve us. The court of equity does not interpret the contract differently from the court of law, but relieves against some of the requirements of the contract, and even of the law bearing upon the contract, where the parties have acted in a way which in equity amounts to a dispensation with those requirements.

My first proposition is, that the Washington Company had notice of this second insurance at the American Office.

This matter is discussed in the opening argument, from page 193 to page 198. Samuel G. Wheeler proves that he sent the notice to Jackson, the president, by letter, in December, 1836. That he sent such a letter, he is certain and positive; the impression upon his memory is, that he personally put the letter in the post-office. Such an impression is satisfactory unless overcome. This evidence is corroborated by other facts and circumstances. His letter of the 13th of December, 1837, to the American Office, accompanied with the evidence of Peck, is strongly corroborative of the above testimony. A letter informing them of a change of ownership, with a request that he, Mr. Peck, would communicate it to the Washington Office, accompanied with Peck's evidence that he is satisfied he communicated this matter to Mr. Jackson, the president, by showing him the letter, because it was his custom to communicate such information in that way, is strong evidence to satisfy the mind that Jackson had such notice.

Would Mr. Jackson receive such information from another office in his immediate neighbourhood, and send the representation of the property to the American Office in November, 1836, without getting from such circumstances notice that there was another insurance in that office? If he could, it is impossible to consider

him the shrewd business man that they represent him to be. This evidence, standing unimpeached, is amply sufficient to satisfy a jury, or a court acting in the place of a jury, that notice of this second insurance in the American Office was brought home to the respondents.

It remains to consider the views taken of this subject on the other side.

It is said the answer of the defendants is evidence in their favor, that they never had such notice.

An answer by a party who states a fact of his own knowledge which is responsive to the bill, and free from all suspicion, is evidence ; but not such an answer as this ; the answer is too good to have any confidence reposed in it. It states, positively, that the defendants had no such notice.

On such a point they could only swear honestly to their belief. Notice, in such cases, is usually given to the officers of the company, who have the active management of the concern. Greene or Jackson would have been the persons to receive it, and it would have been their duty, when received, to have it filed or entered on the minutes. It would only come before the board through their instrumentality. Notice to those officers would in law be notice to the company. How could this corporation say that Jackson had not received such notice ? How could Dorr, the new president, who came in afterwards, and who was a perfect stranger to all these transactions, swear positively that Jackson, in his lifetime, had not received this notice. Experience has shown that answers generally, in litigated cases, but more especially such an answer, should be viewed with great jealousy. The remark in page 202 of the respondents' argument may furnish a clue to this answer. It is said they never had notice, in the sense of this policy, that is, notice to be indorsed or acknowledged. If that is the cover under which this positive denial of notice in the answer rests, it must pass for as much as it is worth.

But the respondents have put in a supplemental answer, in which they qualify, to a certain extent, the positive denial in the first answer, by stating that they had not such notice until long after the execution by these defendants of the policy of the 27th of September, 1838. This clearly implies that they did get such notice, though obtained long after that time, — a notice to be indorsed or acknowledged. They surely did not mean to say that they got such notice after the fire. When did they get it ? What do they mean by *long after* ? It may mean one month or two months. There is a point of time at which it is somewhat important to know whether they had that notice, namely, in December, 1838, when the American policy was renewed. It was their duty to tell us plainly when they got that notice. The manifest inference is, that they got the notice before or at the time of the renewal of the

policy at the American Office, otherwise they would have said they had it not then. This is a circumstance of some importance in the view hereafter to be presented.

It is said that Wheeler has only a loose impression on his mind that he sent the letter to Jackson. He does not give any such epithet. It is the impression on his memory, that he himself put the letter in the post-office. The guarded caution with which he speaks entitles him to the more credit. The reason why Wheeler did not preserve a copy of the letter is sufficiently accounted for.

It is asked why Wheeler did not write again to Jackson, when he received no reply to his letter, and why he did not speak about it to Jackson the next time he saw him. In reply I might ask, Why do merchants and others, when dealing with those in whom they repose confidence, omit to have contracts reduced to writing, when required by the statute of frauds? And when they reduce them to writing, why do it by letter, embracing only the heads, instead of entering into special agreements? We all know, in practice, how these things are done. And perhaps persons dealing with insurance companies are as often as in any other cases inattentive to those niceties and particularities.

To rebut the evidence of Wheeler, much reliance is placed on the testimony of Greene, that no such letter can be found in the Washington Office, no memorandum of it on the minutes or elsewhere, and no entry of its having been laid before the board, as usual in such cases.

There can be no doubt that Wheeler meant to give the notice. He could not have been guilty of the absurdity of having two insurances in two offices in the immediate neighbourhood of each other, and of attempting to conceal a second insurance. A loss and claim for compensation would inevitably lead to detection. It was the interest of Wheeler to give the notice. It was the duty of Jackson, the president, when the notice was received, to lay it before the board and have it entered in the office. Both Jackson and Wheeler are represented in the respondents' argument to be punctual business men. The inference from the interest of Wheeler is, that he sent the notice. The inference from the duty of Jackson is, that it was not sent. The one is a fair set-off against the other. Then we have the positive evidence of Wheeler and of Peck, which are not overcome. The omission to examine Greene as to his personal knowledge on the subject raises a strong suspicion that this letter was received, but omitted to be placed on the files, and that notice was received through Peck. It is said, on the other side, that we ought to have examined him on this point. We rely on our own evidence; they call this witness to rebut it. They go half way in the inquiry, and tell us that we ought to have pursued that inquiry for them, — that we should have examined their own witness, called to rebut our evidence, on the

points on which it was all important he should have been examined in order to render such rebuttal of any avail at all. This would certainly be a novel mode of proceeding.

I shall now proceed to the second proposition. This notice ought to bind the Washington Company in equity.

(This part of the argument is omitted.)

Mr. Justice WOODBURY delivered the opinion of the court.

This was a bill in equity on a policy of insurance made by the defendants. The original policy, executed September 27th, 1835, for one year, and annually renewed till September, 1838, contained the following clauses : — " And provided further, that in case the insured shall have already any other insurance against loss by fire on the property hereby insured, not notified to this corporation, and *mentioned in or indorsed upon* this policy, then this insurance shall be void and of no effect. And if the said insured, or their assigns, shall hereafter make any other insurance on the same property, and shall not, with all reasonable diligence, give notice thereof to this corporation, and have the same *indorsed on this instrument, or otherwise acknowledged by them in writing*, this policy shall cease and be of no further effect." A loss having occurred on the 9th of April, 1839, an action at law was instituted to recover the amount of the defendants, on which final judgment was rendered in their favor in this court, at the January term, 1841. (See Carpenter *v.* Providence Washington Ins. Co., 16 Peters, 495.) This was chiefly on the ground, that another policy had been effected on the same property at another insurance office, in December, 1836, and renewed yearly till December, 1838, but which had not been " mentioned in or indorsed on this policy," " or otherwise acknowledged by them (the defendants) in writing."

For various other particulars connected with the case, reference can be had to the above case, and the statement which precedes this opinion. Under these circumstances, the complainant next resorted to the bill now in consideration, and alleged, that " in the month of December, A. D. 1836, and in the month of December, A. D. 1837, and at divers other times, the said Providence Washington Insurance Company had notice from the said H. M. Wheeler & Co. of the said insurance at the office of said American Insurance Company, in Providence, and said notices, so given, were given for the purpose of having the same indorsed on the policy at the office of said Providence Washington Insurance Company, or otherwise acknowledged by them in writing. And your orator supposed that the said Providence Washington Insurance Company had performed their part of said contract in this behalf, as in equity and good conscience they were bound to do."

He then added, — " Wherefore, inasmuch as your orator is

remediless at and by the strict rules of the common law, he prays your honors to issue a decree compelling said Providence Washington Insurance Company to indorse said notice on said policy, or otherwise acknowledge the same in writing, according to the terms of their policy, as they long since ought to have done, and to compel said Providence Washington Insurance Company to pay your orator said sum of fifteen thousand dollars, with interest from the time of said loss, and his costs."

The defendants, in their answer, deny that they ever had notice in any form of the additional insurance, or not till long after the execution of the policy now in question, and object to the admission of any evidence on the subject, except such as is in writing, according to the stipulation in the policy itself. And they further deny, " that the plaintiff has any equity to compel these defendants to indorse a notice of such previous or subsequent insurance on said policy, or to acknowledge the same in writing."

They then aver, that if the additional policy had been communicated to them, and the present insurance still continued, it would have been void, because false representations, material to the risk in respect to the value of the whole property, were made, affecting the additional policy, and that the probability is, the present one would not have been continued on seeing the additional policy, as that is for $6,000, and the present one $15,000, making an aggregate insurance of $21,000, when, in the original statement to the defendants, the whole property was valued at only $19,000, and when it is not the custom of insurance companies to take risks on this kind of property beyond three fourths of its value, in order to keep the insured still interested to the extent of the other fourth, and thus likely to use greater precautions against fire, and lessen the risk of the insurers, compared with what it would be if an additional insurance was obtained covering the whole value.

It will be seen, by this state of the case, that important questions, both of fact and law, are involved in it ;— of fact, whether the additional policy was ever made known to the defendants for the purpose of being acknowledged in writing ; and of law, whether, in that event, it was their duty so to have acknowledged it, and, not doing so, whether this court can now compel them to do it. There are other considerations which arise in the course of the inquiry that will receive attention, but are incidental, rather than raised directly through the pleadings. The testimony in support of the leading allegation in the bill is not very complicated. But how much of evidence should be required to prove that allegation, under the principles applicable to the circumstances of this case, is one of some difficulty, and is first to be settled. Where an answer is responsive to a bill, and, like this, denies a fact unequivocally and under oath, it must in most cases be proved not only by the testimony of one witness, so as to neutralize that deni-

al and oath, but by some additional evidence, in order to turn the
scales for the plaintiff.    Daniel *v.* Mitchell, 1 Story's Rep. 188 ;
Higbie *v.* Hopkins, 1 Wash. C. C. R. 230 ;. The Union Bank of
Georgetown *v.* Geary, 5 Peters, 99.    The additional evidence
must be a second witness, or very *strong circumstances.*    1 Wash.
C. C. R. 230 ; Hughes *v.* Blake, 1 Mason's C. C. R. 514 ; 3 Gill
& Johns. 425 ; 1 Paige, 239 ; 3 Wend. 532 ; 2 Johns. Ch. R. 92.
Clark's Ex'rs  *v.* Van Riemsdyk, 9 Cranch, 153, says, "with
pregnant circumstances."    (Neale *v.* Hagthrop, 3 Bland's Ch.
567 ; 2 Gill & Johns. 208.)

But a part of the cases on this subject introduce some qualifica-
tions or limitations to the general rule, which are urged as diminish-
ing the quantity of evidence necessary here.    Thus, in 9 Cranch,
160, the grounds of the rule are explained ; and it is thought proper
there, that something should be detracted from the weight given to an
answer, if from the nature of things the respondent could not know
the truth of the matter sworn to.    So, if the answer do not deny the
allegation, but only express ignorance of the fact, it has been adjudg-
ed that one positive witness to it may suffice.    1 J. J. Marshall,
178.    So if the answer be evasive or equivocal.    4 J. J. Mar-
shall, 213; 1 Dana, 174 ; 4 Bibb, 358.    Or if it do not in some
way deny what is alleged.    Knickerbacker *v.* Harris, 1 Paige, 212.
But if the answer, as here, explicitly denies the material allega-
tion, and the respondent, though not personally conusant to all
the particulars, swears to his disbelief in the allegations, and as-
signs reasons for it, the complainant has in several instances been
required to sustain his allegation by more than the testimony of
one witness.    (3 Mason's C. C. R. 294.)    In Coale *v.* Chase, 1
Bland, 136, such an answer and oath by an administrator was
held to be sufficient to dissolve an injunction for matters alleged
against his testator.    So is it sufficient for that purpose if a corpo-
ration deny the allegation under seal, though without oath (Haight
*v.* Morris Aqueduct, 4 Wash. C. C. R. 601) ; and an administrator
denying it under oath, founded on his disbelief, from information
communicated to him, will throw the burden of proof on the
plaintiff beyond the testimony of one witness, though not so much
beyond as if he swore to matters within his personal knowledge.
3 Bland's Ch. 567, note ; 1 Gill & Johns. 270 ; Pennington *v.* Git-
tings, 2 Gill & Johns. 208.    But, what seems to go further than
is necessary for this case, it has been adjudged in Salmon *v.* Cla-
gett, 3 Bland, 141, 165, that the answer of a corporation, if call-
ed for by a bill, and it is responsive to the call, though made by a
" corporation aggregate under its seal, without oath," is competent
evidence, and " cannot be overturned by the testimony of one wit-
ness alone "    We do not go to this extent, but see no reason why
such an answer, by a corporation, under its seal and sworn to by
the proper officer, with some means of knowledge on the subject,

should not generally impose an obligation on the complainant to prove the fact by more than one witness. (5 Peters, 111 ; 4 Wash. C. C. R. 601.)   Here the denial by the corporation is explicit and responsive to the bill, and its truth sworn to by its president, " according to the best of his knowledge and belief."   The only difficulty is in respect to the extent of that knowledge.  He was not the president of the company at the time the information of the second insurance is alleged to have been given.   Nor is it relied on in argument, that he was then a member and lived near, or was for any reason likely to be consulted when such notices were received.   But he has since had access to all the files and records, in his official capacity, so as to know if any letter on this subject appears to have been received, and therefore testifies with some means of knowledge.   And though it is admitted, that the certainty is not so great against the reception of the notice as if Jackson himself was alive and testified against it, yet, in the nature of the case and by the precedents, the denial is strongly enough made and supported to impose on the complainant the proof of his allegation by something more than the testimony of one witness, though not so much more, it is conceded, as the " pregnant circumstances " before alluded to.

The next inquiry is, whether the material allegation in this case is thus proved ?   On an examination of the evidence, it will be found that not even one witness swears positively to it ; and whatever is sworn in support of it is much impaired by other proof.

The allegation, it will be remembered, is, that in December, 1836, and divers other times, the defendants had notice from the insured of the second insurance, given for the purpose of being indorsed on the policy, or acknowledged in writing.

There is no attempt to prove any such notice except on two occasions, — one in 1836, and one in 1837.   The only witness called to support the first is Mr. Wheeler.   He testifies, that about the time of the second insurance, in December, 1836, he wrote a letter to the president of the Providence Washington Company, stating that such an insurance had been effected, and thinks he put the letter in the post-office.   This is all on that point in behalf of the complainant concerning this notice.

It is to be observed, that the testimony of Wheeler, in its full extent, does not prove the fact that information of the second insurance ever actually reached the defendants for the purpose of being indorsed or acknowledged, but merely that a letter was written for that purpose, and probably put in the post-office.

Though such evidence, standing alone, in the case of notice of non-payment of bills of exchange and promissory notes, is sufficient, under mercantile usage, to raise a presumption that the holder had used due diligence, yet even in such cases it is not held to prove the actual receipt of notice.   The Bank of Columbia v. Lawrence, 1

Peters, 582, and Dickins v. Beal, 10 Peters, 581. Much less can it prove the receipt of it where no such usage exists, as in the case of policies of insurance.

When we look for any other proof to sustain or strengthen Wheeler's evidence, thus defective, it will appear to be weakened rather than strengthened by the other testimony and circumstances. Because, first, such a letter, if ever received, would probably be preserved on the files of the office. So would it probably be answered, as that was not only the usage in respect to all letters on official business, but it is shown, specially, to have been the custom of the office to act forthwith and officially on letters like these when received, and to send a reply in conformity to the decision of the company upon them. Yet no answer is stated ever to have been received concerning this ; nor is any trace of an answer, or of the original, found in the office, either in the recollection of other officers, or in any files, books, records, or even memoranda.

. Again ; the insured, if conscious that such a letter had been sent, and reached its destination without being answered, would naturally have written, or called to ascertain, why information of the second insurance was not acknowledged in writing, apprized as the insured must be, both by the published terms of insurance and the policy itself, that the latter was void and ceased to operate without such an acknowledgment, and that it was the duty and interest of the insured to see to this acknowledgment being made   Nor is it a sufficient answer to the last objection, that he might rest quiet without a reply, supposing the acknowledgment had been indorsed on the policy, because the policy was in the possession of the insured, and not of the insurers ; and hence it was well known to the insured that no such indorsement had been made on that.

It is difficult, likewise, to discover any adequate motive for not replying to the letter, if it was ever received, unless it be one resting on a gross fraud. If the company, or its president, on a receipt of it, should not choose to continue the policy, as would probably be the case, for reasons before mentioned, they would feel no reluctance to state the fact to the insured, and thus end a risk where the insurance exceeded the value of the property, and differed so much from their usual prudent terms of underwriting. But if they did choose to continue it, they would be likely soon to reply, stating that fact, because, without such a reply, they knew the insured would probably consider the policy terminated, in conformity with the stipulations in it, and would insure elsewhere, and they lose a premium which they had decided it was expedient for the company to retain.

This is all which it is considered necessary to say in respect to the evidence of the notice supposed by the plaintiff to have been given by Wheeler in 1836.

But it is urged, beside this, that another notice of the additional insurance at the Providence American Company was given the ensuing year, in December, 1837, through Mr. Peck. It is manifest, however, that this last notice, like the other, must stand or fall by itself, as they are distinct or disconnected in time and circumstances, — not parts of one transaction, — and are attempted to be sustained by testimony not cumulative but entirely different. What is proved on this matter by Mr. Peck ? Merely that a letter, written to him for another purpose, contained a statement of the existence of the second insurance, and his impression that he showed the letter to the president of this company for the other purpose. It will be seen that his testimony is rather argumentative from his usual habits of business, than positive, that he showed the letter at all to the president ; but if he did, it is conceded that the object was to communicate merely the other fact, — " the change of owners in the property " (see Wheeler's letter). And if he carried the letter in his hands, which contained other matter, mentioning an insurance at the American Office, he was not desired, as appears by the letter itself, to communicate that part of it, nor does he say, in his written reply, that he had communicated that part, but only " notified the Providence Washington Insurance Company, that Mr. Wheeler had disposed of his interest to you, of which they had made record."

Beside this, and against any such notice having been given or intended for the purpose set up in this bill, there are most of the collateral considerations which have been enumerated in opposition to the other notice, alleged to have been given the previous year.

It must also be recollected, that a letter was written to the president by Wheeler on the same day he wrote to Peck, saying nothing in it concerning any second insurance ; and the president promptly answered it, saying nothing in reply concerning that subject, but all which was expected as to the other. On this, it will occur immediately to ask, if Peck had given such notice, or been requested to do it, or even if Wheeler had before given it, why Wheeler did not at once write again, stating that an answer had been received as to the notice of a change of property, but none as to the second insurance. In short, a convincing proof that nothing was communicated but the change of owners in the property is, that nothing more seems intended to have been communicated ; that nothing more was contained in the letter to the president, and nothing more wished to be stated by Peck, and no witness testifies that the other information was actually read by, or named to, the president, and no collateral fact renders the last circumstance probable. This is the whole evidence in the case, on this point, that is essential. To show more fully that under it none of the material questions of law arise or can be considered, which might otherwise be presented, it may not be unimportant to discrim-

inate and examine briefly what those questions are, and what must be proved in order to raise them.

Several precedents exist, where respondents in equity are allowed, by way of defence, to prove, by parol, that the written contract relied on does not contain all the original terms agreed, and in this way entitle themselves to be exonerated under the terms proved by parol. (Woollam v. Hearn, 7 Ves. 211 ; 2 Story's Eq. Jurisp. § 770 ; and Sugden on Vendors, 125 to 140, and cases cited.) Others exist, of this kind of proof being at times permitted to complainants in relation to separate subsequent terms of agreement modifying the prior ones, and on those subsequent terms being proved by parol, a recovery be allowed. 4 Bro. Ch. R. 514 ; 1 ibid. 92. There are other precedents of complainants seeking to show by parol a portion of a contract existing when the original was made, but which was omitted from it by accident, and against doing which some of the authorities seem to decide. (7 Ves. jr. 211 ; 15 ibid. 518 ; Story's Eq. Jurisp. § 770, and note.) On the contrary, some decide for it. (2 Ves. sen. 375 ; 1 ibid. 456 ; 1 Starkie on Ev. 1015 – 1018.) But neither of these classes of cases can be claimed as embracing this. Here the parol proof is offered by a complainant, rather than by way of defence ; and it is not pretended that any omission has happened of a part of the original contract, or that there has been any new separate contract modifying that.

On the contrary, in the most natural aspect of the case, it is one of a complainant attempting to show, by parol, a fact, which, if true, is supposed to establish a neglect or wrong in the defendants, — a breach of official duty happening sometime after the contract of insurance was made, — by not acknowledging then in writing the receipt of information that another policy had been obtained on the property, and saying in reply, under these new circumstances, that the first contract should either continue or terminate.

This presents, it will be seen, a question somewhat novel, namely, whether the specific performance of a duty in private life, not of a contract, can be enforced by courts of equity, and a party compelled, by a sort of mandamus, to acknowledge in writing what he had never promised so to acknowledge.

That question, however, need not now be decided, as such a duty is not claimed to exist except where a notice of the second insurance is actually received. And to prove such a receipt here, the evidence offered is certainly insufficient, whether requiring only one positive witness, unimpaired, or something more than one.

But there is another aspect of the case, which would present a different question of law, if it was set out specially in the bill, and was supported by any stronger proof as to the material fact. It is, that the respondent should be considered as barred or estopped

from setting up the want of an acknowledgment in writing, if that want was the result of his own neglect of duty. In that view, both the receipt of the information, and a consequent obligation to make an acknowledgment of it in writing, must be satisfactorily established before any neglect of duty can be imputed. But, as already shown, the first fact, the receipt of the information, is not established in that manner ; and, if it were, some difficulty might exist as to the second point, in considering a mere omission to reply as a wrong, and such a wrong as to estop the insurers from making an objection expressly provided for and allowed in the policy. Because it is not the insurer, but the insured, on whom the obligation seems to be imposed to have the notice of the further insurance reduced to writing, as a condition precedent to a recovery. It is the insured who by that further insurance increases the risk of the former insurers, and who ought, therefore, to have it both communicated and acknowledged in the manner stipulated, in order to render it sure that a continuance of the first risk is assented to. And though an omission to answer a letter from the insured might incommode him, and be a breach of comity, it is not easy to discover any engagement or promise which it violates.

Supposing, however, the bill to be broad enough in its allegations, and the sending of notice of the second insurance proved, and the duty to acknowledge it, if received, to be clear, we might, in most cases like this, enforce a discovery of the receipt of it, if coming to hand ; and might enjoin the insurers against using, by way of defence, a circumstance caused by their own misconduct. (Baker v. Biddle, 1 Bald. C. C. R. 405.) But whether we could go further, and enforce a recovery for the loss on the equity side of this court, when an action had been brought for it on the law side and failed, and other remedies there may still exist for any wrong done, is a question open to doubt, and need not, for the reasons before stated, be now decided. Le Guen v. Gouverneur, 1 Johns. Cas. 436 ; Simpson v. Hart, 1 Johns. Ch. R. 91 ; Gordon v. Hobart, 2 Sumner's C. C. R. 401.

Finally, it is urged, that a fraud has been perpetrated here, and that frauds constitute at all times a distinct and sufficient ground for a recovery in chancery. The fraud, if existing here, would not be in failing to answer the receipt of information of the second policy, stating frankly, as convenience and a spirit of courtesy required, whether the original insurance would be continued longer or not ; but in omitting to give full explanations on the subject when the insured applied for a renewal of the policy, and in proceeding then to take a further premium, with a covert design to defeat the insurance on account of the second policy, provided any loss should happen.

The rule of equity is very broad to prevent a *fraud*, which would exist if one was permitted " to derive a benefit from his

own breach of duty and obligation." 2 Story's Eq. Jurisp. § 781. And it has been laid down, that "if by fraud or misrepresentation one prevents acts from being done, equity treats the case as if it were done." 1 ibid. § 439 ; 11 Ves. 638.

In the bill, there is an averment of fraud, and, at the close, a general prayer for any suitable relief ; and it seems plausible, that we might, if satisfied of the existence of fraud, estop the party guilty of it from profiting through his own wrong, by preventing him from setting up, as a defence, the want of an acknowledgment in writing, when such want was the result or the instrument of his own misbehaviour. But there is still a difficulty in this view of the case, from the circumstance that redress has been and still is open to the plaintiff, at law, for any fraud ; and the Judiciary Act provides, that " suits in equity shall not be sustained in either of the courts of the United States in any case where plain, adequate, and complete remedy may be had at law." (Act of September 29th, 1789, § 16 ; 1 Story, 59.) And also from another reason, which has affected the previous points, — a want of satisfactory evidence of the facts alleged. The first step in proving a fraud fails. Neither a neglect nor wrong is shown by the positive testimony of any one witness ; and whateve is sworn to by any one in behalf of the complainant is counteracted by opposing circumstances, rather than strengthened, as it should be, after a sworn denial in the bill, and in so grave a charge as fraud, by very satisfactory auxiliaries, though not perhaps by so strong evidence as is necessary in reforming contracts ; that is, by evidence which is " irrefragable," and not open " to opposing presumptions." 1 Bro. Ch. 347 ; 2 Cranch, 419 ; 1 Ves. sen. 317 ; 6 Ves. 332 ; 8 Wheat. 211 ; 1 Peters, 13 ; 2 Johns. Ch. 595, 630.

It is a matter of regret, that so great a loss, which the plaintiff and those under whom he claims intended to guard against by insurance, should happen entirely without indemnity. But it is to be remembered, that the defendants gave abundant and repeated notice to him in writing and print in the policy itself, as well as other ways, that they would not take any risks on property where it was insured beyond a certain ratio of its full value, unless the circumstances were made known to them, and the additional policy recognized in writing, so as to avoid any mistake, or accident, or want of deliberate attention to the subject.

If the plaintiff, after all this, omitted to comply with so substantial a provision in the contract itself, as we are bound to believe on the evidence now offered, we see no way, equitably or legally, to prevent the consequences from falling on himself, rather than others, being the result either of his own neglect, or that of some of the agents he employed.

An adherence to such important rules is peculiarly necessary for the protection of absent stockholders, often interested extensively

in insurance companies ; and so far from its being unconscientious to enforce them, when their existence is well known, and when the risk has been increased without conforming to them, it is the only and just safeguard of all concerned in such institutions

Let the judgment below be affirmed.

Mr. Chief-Justice TANEY, being sick, did not sit in this cause.